**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 10-cv-02349-WJM-KMT

CHIMNEY ROCK PUBLIC POWER DISTRICT,
MIDWEST ELECTRIC COOPERATIVE CORPORATION,
NORTHWEST RURAL PUBLIC POWER DISTRICT, and
PANHANDLE RURAL ELECTRIC MEMBERSHIP ASSOCIATION,

      Plaintiffs,

v.

TRI-STATE GENERATION AND TRANSMISSION ASSOCIATION, INC.,

      Defendant.

_____

TRI-STATE GENERATION AND TRANSMISSION ASSOCIATION, INC.,

      Counterclaim Plaintiff,

v.

CHIMNEY ROCK PUBLIC POWER DISTRICT,
MIDWEST ELECTRIC COOPERATIVE CORPORATION,
NORTHWEST RURAL PUBLIC POWER DISTRICT, and
PANHANDLE RURAL ELECTRIC MEMBERSHIP ASSOCIATION,

      Counterclaim Defendants.

_____

TRI-STATE GENERATION AND TRANSMISSION ASSOCIATION, INC.,

      Third-Party Plaintiff,

v.

RYAN REIBER, and
JERRY UNDERWOOD,

      Third-Party Defendants.

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

In this diversity action, Plaintiffs Chimney Rock Public Power District ("Chimney

Rock"), Midwest Electric Cooperative Corporation ("Midwest"), Northwest Rural Public

Power District ("Northwest"), and Panhandle Rural Electric Membership Association

("PREMA") (collectively "Plaintiffs") bring contract claims against Defendant Tri-State

Generation and Transmission Association, Inc. ("Tri-State" or "Defendant").  (ECF No. 1.)

This matter is before the Court on Defendant's Motion for Summary Judgment ("Motion"),

and Plaintiffs' Motion for Partial Summary Judgment ("Cross-Motion").  (ECF Nos. 192 &

195.)  For the reasons set forth below, Defendant's Motion is granted in part and denied

in part, and Plaintiffs' Cross-Motion is denied as moot.

## I.  BACKGROUND

The relevant facts, viewed in the light most favorable to Plaintiffs, are as follows.

Tri-State is a Colorado corporation, originally formed in 1965 by twenty-six electrical power

distribution cooperatives and public power districts in the states of Colorado, Nebraska,

and Wyoming for the purpose of furnishing long-term wholesale power and energy to the

member cooperatives and districts, which in turn provide power to consumers in their

separate geographical areas.  (ECF No. 84 ¶¶ 10, 16.)  Tri-State is now comprised of forty-

four members located in the three original states plus New Mexico.  (*Id.* ¶¶ 72, 74.)

Plaintiffs Chimney Rock, Midwest, Northwest, and PREMA are all "Class A" members of

Tri-State, operating in Nebraska since 1965 under All Requirements Contracts with Tri-

State for the provision of wholesale electric service.  (*Id.* ¶¶ 2-5, 17.)

Effective November 1, 2001, each of the Plaintiffs signed an extension of the All Requirements Contract with Tri-State with a term extending through the year 2040 ("2001 Contract").  (*Id.* ¶ 8.)  Effective July 1, 2007, each of the Plaintiffs signed a new extension of the All Requirements Contract with Tri-State with a term extending through the year 2050 ("2007 Contract").  (*Id.*)  Both the 2001 Contract and the 2007 Contract contain Colorado choice of law provisions.  (ECF No. 196-1 at 43, 56.)

Since 1965, the All Requirements Contracts between Tri-State and its members have provided that Tri-State's Board of Directors shall set the rates paid by its members for electric service on at least an annual basis, and that the rates shall be set so as to produce revenues sufficient to meet Tri-State's operating costs.  (*Id.* at 13, 29, 38-39, 51.)  From 1965 through at least 2012, on an annual basis in accordance with these contractual provisions, Tri-State's Board of Directors has set a "Postage Stamp Rate" for its electric service.  (ECF Nos. 196-2 ¶ 6-7; 208-1 at 5.)  Under a Postage Stamp Rate, each Class A Member is required to pay the same price per unit of electrical power regardless of how far the power is transmitted or the actual cost of serving that member. (*Id.*)  Although the Board of Directors has used a Postage Stamp rate since Tri-State's inception, it is not required to continue to use the Postage Stamp Rate, and may use a different rate calculation methodology at any time.  (ECF No. 208-2 at 19.)  At times, Tri-State has imposed "Special Rates" and "ratchet charges" on certain electricity purchases or during particular times of year based on calculations that differ from the annual Postage Stamp Rate method.  (ECF Nos. 208-3 at 23; 208-4 at 49.)

In early 2007, before signing the 2007 Contract, representatives of Plaintiffs contacted Tri-State both in person and in writing regarding the Postage Stamp Rate

3

system, contending that it was unfair because it resulted in Plaintiffs paying a rate that greatly exceeded Tri-State's cost in providing them electrical power.  (*See* ECF Nos. 208-2 at 66-67; 208-4 at 56-57, 75.)  After Plaintiffs signed the 2007 Contract, they continued to attempt negotiations with Tri-State's Board of Directors regarding their rate concerns. (*Id.*; ECF No. 84 ¶ 8.)  In the course of these discussions, Tri-State staff prepared an analysis comparing the estimated cost of serving Plaintiffs to the revenues from such service, which ultimately concluded that Tri-State "broke even" in serving Nebraska. (ECF No. 208-2 at 12.)  However, this analysis contained multiple errors that overstated Tri-State's costs, including miscalculating overhead, double-counting the Nebraska proxy transmission rate, and calculating Nebraska transmission expenses using the wrong billing units.  (ECF Nos. 208-1 at 30; 208-3 at 26, 57-58; 208-5 at 6-8.)  A similar analysis was prepared using 2008 data and was presented to the Board of Directors in July 2009. (ECF No. 208-5 at 13-48.)

In April 2009, after Plaintiffs' negotiations with Tri-State's Board of Directors had failed to alter the Postage Stamp Rate imposed on them, Plaintiffs each requested that the Board determine equitable terms and conditions to allow them to withdraw from Tri-State membership.  (ECF No. 196-1 at 6.)  These requests were made pursuant to Tri-State's Bylaws providing that a "member may withdraw from membership upon compliance with such equitable terms and conditions as the Board of Directors may prescribe provided, however, that no member shall be permitted to withdraw until it has met all of its contractual obligations to [Tri-State] . . . ."  (*Id.* at 60.)

As a result of Plaintiffs' requests for withdrawal terms and conditions, Tri-State's Board of Directors appointed a seven-person committee, the "Nebraska Withdrawal

Committee", to calculate and establish such terms.  (*Id.* at 6.)  The Nebraska Withdrawal Committee developed proposed terms and conditions for Plaintiffs' withdrawal by calculating the payment amount that would put Tri-State in the same financial position it would have been in if each Plaintiff had fulfilled its obligations for the full term of the 2007 Contract, through the year 2050.  (*Id.*)  This calculation, performed by Tri-State's staff, entailed estimating the lost revenues from Plaintiffs' withdrawal, subtracting the avoided costs of providing Plaintiffs with power, and subtracting estimated revenue gained from leasing Tri-State's Nebraska transmission lines to Plaintiffs' new power supplier, all for the full duration of the contract term.  (*Id.* at 6-7.)  The Nebraska Withdrawal Committee did not consider any other methodology of determining buyout amounts or compare this methodology to other similar generation and transmission associations' member withdrawal calculations.  (ECF No. 208-1 at 46.)

The final proposed withdrawal terms and conditions were presented to Tri-State's Board of Directors on September 1, 2009.  (ECF No. 196-1 at 7.)  Those terms and conditions, which required Plaintiffs to pay sums ranging from $21,285,000 to $101,028,000, were approved by the Board and communicated to Plaintiffs in letters dated September 2, 2009.  (*Id.* at 7, 63-70.)  Plaintiffs did not accept these terms for withdrawal.  (*Id.*)

On September 28, 2009, Plaintiffs filed their Complaint in the District of Nebraska against Tri-State and various individual defendants[1], alleging breach of contract, breach of fiduciary duty, and related claims.  (Compl. (ECF No. 1-2).)  On January 15, 2010, Tri-

---

[1] The individual defendants were subsequently dismissed from the action.  (*See* ECF Nos. 1-26, 146.)

State filed a Motion to Dismiss.  (ECF No. 1-40.)  The District of Nebraska then granted a Motion to Change Venue under 28 U.S.C. § 1404(a), and the case was transferred to this Court on September 24, 2010.  (ECF Nos. 1-71, 1-77.)

On December 3, 2012, Tri-State filed an Amended Answer and Counterclaims against Plaintiffs, as well as Third-Party Claims against four individual Third-Party Defendants.  (ECF No. 84.)  Two of the Third-Party Defendants and Tri-State's claims against them were subsequently dismissed.  (ECF No. 252.)

After Tri-State's Motion to Dismiss was granted in part (ECF No. 31), and additional claims were dismissed based on the parties' stipulations (ECF Nos. 138, 146), Plaintiffs have three remaining claims against Tri-State:  Claim 1, alleging breach of contract based on Tri-State's failure to fairly set rates, resulting in a breach of the implied covenant of good faith and fair dealing; Claim 2, alleging breach of the implied covenant of good faith and fair dealing based on the same allegations (together, the "Rate Claims"); and Claim 4, alleging breach of contract based on Tri-State's failure to equitably provide terms for Plaintiffs' withdrawal from Tri-State ("Withdrawal Claim").  As Plaintiffs have conceded and the Court has previously noted, the Rate Claims make identical arguments and are based on the same legal theory.  (ECF No. 31 at 3 n.1; ECF No. 1-52 at 10 n.4.)

On June 14, 2013, Tri-State's Motion (ECF No. 195) and Plaintiffs' Cross-Motion (ECF No. 192) were filed.  On July 5, 2013, the parties filed their Responses (ECF Nos. 205 & 208), and on July 22, 2013, they filed their Replies (ECF Nos. 228 & 229).

## II.  LEGAL STANDARD

Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c);

6

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994).  Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury, or conversely, is so one-sided that one party must prevail as a matter of law.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248-49 (1986); *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132 (10th Cir. 2000); *Carey v. U.S. Postal Serv.*, 812 F.2d 621, 623 (10th Cir. 1987).

A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable party could return a verdict for either party.  *Anderson*, 477 U.S. at 248.  The Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial.  *Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## III.  ANALYSIS

Tri-State contends that summary judgment is appropriate on both the Rate Claims and the Withdrawal Claim, while Plaintiffs move for summary judgment only on Tri-State's statute of limitations affirmative defense as applied to the Rate Claims.  (ECF Nos. 192 & 195.)  The Court will discuss each argument in turn.

### A.    Rate Claims

Tri-State argues that it is entitled to summary judgment on Plaintiffs' Rate Claims, which both allege a breach of the implied covenant of good faith and fair dealing, because there are undisputed facts establishing that no such breach occurred.  (ECF No. 196 at 26-34.)

Under Colorado law, every contract contains an implied duty of good faith and fair dealing.  Colo. Rev. Stat. §§ 4-1-304; 4-1-201(b)(19).  "Good faith performance of a contract involves 'faithfulness to an agreed common purpose and consistency with the justified expectations of the other party,'" and the doctrine is used to effectuate the parties' intentions or honor their reasonable expectations for the contract performance. *Amoco Oil Co. v. Ervin*, 908 P.2d 493, 498 (Colo. 1995) (quoting *Wells Fargo Realty Advisors Funding, Inc. v. Uioli, Inc.*, 872 P.2d 1359, 1362 (Colo. App. 1994)).

The duty of good faith and fair dealing applies "when one party has discretionary authority to determine certain terms of the contract," in that the contract defers a decision regarding performance and grants one party the "power after contract formation to set or control the terms of performance." *Id.*  That power is misused and "[a] party's justified expectations are violated if evidence indicates it would not have signed the contract had it known of the manner in which the party given discretion would exercise its discretion to determine open terms under a contract."  *ADT Sec. Servs., Inc. v. Premier Home Prot., Inc.*, 181 P.3d 288, 293 (Colo. App. 2007).  That is, if a party uses its contractual discretion "to act dishonestly or to act outside of accepted commercial practices to deprive the other party of the benefit of the contract", the implied covenant is breached. *Id.*  Because the determination of the scope of a party's justified expectations is a factual issue, it is generally inappropriate for summary judgment unless "reasonable minds could not differ in concluding that the alleged breaching party did not wrongfully exercise its discretionary power or contractual authority" beyond the other party's assumed risks or in violation of its justified expectations.  *J.R. Simplot v. Chevron Pipeline Co.*, 563 F.3d

8

1102, 1113 (10th Cir. 2009) (brackets and ellipsis omitted).

Here, Tri-State argues that the undisputed facts establish that its Postage Stamp Rate methodology, utilized since 1965, was established well before Plaintiffs signed the 2001 and 2007 Contracts, and thus Tri-State's use of its discretion to continue to use a Postage Stamp Rate could not have violated Plaintiffs' justified expectations.  (ECF No. 196 at 28-34.)  Plaintiffs contend in response that the historical use of the Postage Stamp Rate is not dispositive, because Plaintiffs reasonably expected Tri-State to set rates that were fair to its members, and there are numerous disputes of fact as to whether the rates were fair to Plaintiffs.  (ECF No. 208 at 26-31.)  Plaintiffs further argue that Tri-State's various deviations from the Postage Stamp Rate, and Tri-State's assurances that it would continue to negotiate with Plaintiffs regarding their rate concerns, demonstrate that their expectation of a lower, cost-based rate was justified.  (*Id.* at 31-36.)

Plaintiffs correctly note that there are numerous factual disputes regarding whether the Postage Stamp Rate was fair to Plaintiffs, and that the question of its fairness cannot be resolved on summary judgment.  (ECF No. 208 at 26.)  However, Plaintiffs misinterpret the purpose of the implied covenant, which is not to ensure fairness to all parties in a contract's outcome, but to ensure that no party uses contractual discretion in a way that could not reasonably have been anticipated at the time of contracting.  Thus, the fairness of the Postage Stamp Rate is not the key issue for purposes of the instant Motion.  Rather, the issue before the Court is whether there is any dispute of fact as to the scope of Plaintiffs' assumed risks and justified expectations regarding Tri-State's use of its discretion to set rates, such that Plaintiffs would not have signed the Contracts if they had known Tri-State would use its discretion to set Postage Stamp Rates.  *See ADT*, 181 P.3d at 293.

In this context, the Court finds Plaintiffs' arguments unavailing.  The undisputed facts here show that during the nearly fifty-year contractual history between Tri-State and its members, the Tri-State Board of Directors has repeatedly used its discretion to set a Postage Stamp Rate.  (*See* ECF Nos. 196-2 ¶ 6-7; 208-1 at 5.)  Given this decades-long course of conduct among the parties, "reasonable minds could not differ in concluding" that the parties' justified expectations encompassed Tri-State's discretionary decision to continue using a Postage Stamp Rate.  *See J.R. Simplot*, 563 F.3d at 1113.

Tri-State's various deviations from the Postage Stamp Rate support Tri-State's position, not Plaintiffs'.  These deviations, such as Tri-State's use of "Special Rates" from 2003 to 2005 and "ratchet rates" in the 1980s, establish that Tri-State used its discretion broadly, such that Plaintiffs could not have justifiably expected that discretion to be narrowly circumscribed at the time they signed the 2007 Contract.  (*See* ECF No. 208 at 31-32.)

Plaintiffs also contend that they understood the rate-setting decision to be a matter handled by the Board of Directors, separate from the contract negotiations, and that their agreement to sign the 2007 Contract was made with the understanding that their rate concerns would continue to be heard by the Board.  (*Id.* at 12-14.)  While Plaintiffs may have had a justified expectation that Tri-State could potentially change its rate given its broad discretion to do so, it does not follow that Tri-State's decision *not* to change its rate exceeded the reasonably expected scope of that discretion.  Instead, this supports Tri-State's argument that at the time of contracting, Plaintiffs assumed the risk that Tri-State's rate-setting discretion would continue to be exercised broadly, including the possibility of a continued Postage Stamp Rate.

Plaintiffs emphasize the unfairness of Tri-State's rate system, stating that the use of the "ratchet rate" shows that Tri-State sometimes believed "rates should be based on cost, but only when it suits Tri-State's purpose", and that the Board's "discretion to set rates would be unfettered if not circumscribed by the implied covenant of good faith and fair dealing." (ECF No. 208 at 32, 38.) However, this argument demonstrates that Plaintiffs understood the "unfettered" nature of the Board's rate-setting discretion at the time they signed the Contracts. As the Tenth Circuit has held, "it is possible to so draw a contract as to leave decisions absolutely to the uncontrolled discretion of one of the parties and in such a case the issue of good faith is irrelevant." *Big Horn Coal Co. v. Commonwealth Edison Co.*, 852 F.2d 1259, 1267 (10th Cir. 1988) (citing *Tymshare, Inc. v. Covell*, 727 F.2d 1145, 1153 (D.C. Cir. 1984)). That is, where the scope of discretion in a contract is written so broadly that the parties at the time of contracting could not reasonably expect conditions or limits on that discretion, the duty of good faith is circumscribed accordingly. The Court does not find such utterly unfettered discretion here, as Tri-State is required under the Contracts to set rates so as to cover Tri-State's operating costs. (*See* ECF No. 196-1 at 29, 38-39, 51.) However, the undisputed historical course of conduct between the parties demonstrates that Plaintiffs knew of the breadth of Tri-State's scope of discretion in setting rates. As such, no reasonable jury could find that the continued use of a Postage Stamp Rate violated Plaintiffs' justified expectations.

Therefore, the Court finds no dispute of fact as to whether the implied covenant of good faith and fair dealing was violated by Tri-State's continued use of Postage Stamp Rates. Accordingly, Tri-State's Motion is granted as to the Rate Claims.

11

## B.    Withdrawal Claim

Tri-State makes two arguments that summary judgment should be granted in its favor with respect to Plaintiffs' Withdrawal Claim: (1) Plaintiffs can establish no damages because Tri-State used its valid Postage Stamp Rates in calculating withdrawal terms; and (2) the business judgment rule shields Tri-State from liability for its withdrawal terms calculation because its decisions were made within the exercise of an honest business judgment.  (ECF No. 196 at 34-39.)

### 1.    Withdrawal Damages

Tri-State first argues that its method of calculating the withdrawal terms for Plaintiffs was valid, and therefore Plaintiffs have no damages.  Tri-State states that its withdrawal terms calculation was modeled on the damages calculation made by the Tenth Circuit in a case Tri-State brought against a former member that had breached its contract.  (ECF No. 196 at 35-40 (citing *Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*, 874 F.2d 1346 (10th Cir. 1989)).)  Because Tri-State's Bylaws require a withdrawing party to "m[e]et all of its contractual obligations" (ECF No. 196-1 at 60), Tri-State presumes that the result of Plaintiffs' complying with this requirement would be to make Tri-State "whole".  (ECF No. 196 at 35 (quoting *Shoshone*, 874 F.2d at 1361).)  Tri-State cites a statement by Plaintiffs' expert that if the use of Postage Stamp Rates is valid, the Nebraska Withdrawal Committee correctly calculated the amounts Plaintiffs would have to pay to put Tri-State in the position it would have been in had Plaintiffs fulfilled the remainder of the 2007 Contract term.  (ECF No. 196 at 36-37.)  Accordingly, Tri-State argues, the withdrawal terms were validly calculated, and

Plaintiffs can establish no damages from Tri-State's calculations.  (*Id.*)

The Court disagrees.  Plaintiffs' Withdrawal Claim asserts not only that the Postage Stamp Rate should not have been used, but also that Tri-State's methodology for calculating withdrawal terms was flawed because it was based on a breach of contract theory and entailed erroneous cost calculations.  (Compl. p. 43.)  Plaintiffs dispute that their payment to withdraw as Tri-State members should be calculated as if Plaintiffs had breached the 2007 Contract so as to make Tri-State whole, when it is undisputed that Plaintiffs are not in breach.  (ECF No. 208 at 40.)  Tri-State's argument erroneously assumes that the only disputed element of the withdrawal calculation was the use of the Postage Stamp Rate.  (ECF No. 196-1 at 60.)  However, Plaintiffs contend that Tri-State failed to consider or review alternative methods for calculating the price of Plaintiffs' contractual obligations, and that Tri-State's use of a breach of contract methodology was a bad faith attempt to prevent Plaintiffs from withdrawing.  (ECF No. 208 at 40.)  Plaintiffs further argue that Tri-State used the wrong measure of its costs for transmitting power to Plaintiffs in calculating the withdrawal terms.  (*Id.*)

Plaintiffs' arguments point to factual disputes as to whether Tri-State complied with its contractual obligations to determine "equitable" withdrawal terms.  If the facts are as Plaintiffs contend, the withdrawal amounts Tri-State proposed were calculated to be unreasonably high to prevent Plaintiffs from withdrawing, and Plaintiffs have suffered damages from being unable to withdraw and therefore remaining obligated to continue to pay Tri-State's rates.  Accordingly, there are disputes of fact as to whether Plaintiffs have suffered damages, and Tri-State is not entitled to summary judgment on the Withdrawal Claim based on the lack of damages.

13

2.    <u>Business Judgment Rule</u>

Tri-State next argues that under Colorado's business judgment rule, the Nebraska

Withdrawal Committee's calculations of withdrawal terms cannot be second-guessed by

the Court.  (ECF No. 196 at 37-39.)

The business judgment rule protects the good faith acts of directors of

corporations where those acts are both "within the powers of the corporation and within

the exercise of an honest business judgment".  *Rywalt v. Writer Corp.*, 526 P.2d 316, 317

(Colo. App. 1974).  The business judgment rule shields from liability a director's exercise

of discretion when it is an honest business judgment made in good faith and is not

arbitrary.  *Colo. Homes, Ltd. v. Loerch-Wilson*, 43 P.3d 718, 724 (Colo. App. 2001) (citing

*Rhue v. Cheyenne Homes, Inc.*, 168 Colo. 6, 449 P.2d 361 (1969)).

Plaintiffs contend that the business judgment rule does not apply to protect a

corporation, and only shields the directors from individual liability.  (ECF No. 208 at 39.)

The Court finds this contention unsupported by the case law Plaintiffs cite, in which the

Colorado Courts of Appeals addressed only whether the business judgment rule

protected individual directors.  *See id.* (citing *Kim v. Grover C. Coors Trust*, 179 P.3d 86,

89 (Colo. App. 2007); *Polk v. Hergert Land & Cattle Co.*, 5 P.3d 402, 403 (Colo. App.

2000)).  Colorado courts have applied the business judgment rule to protect a

homeowner's association in a breach of contract action, not only the directors making a

decision on the association's behalf.  *Colo. Homes*, 43 P.3d at 724.  Accordingly, the

Court finds that the business judgment rule likely applies here.

Nevertheless, the Court finds that summary judgment based on the business judgment rule is not warranted.  The business judgment rule shields from liability only honest business decisions made in good faith, and not arbitrarily.  *See id.*  Plaintiffs have presented evidence that the Nebraska Withdrawal Committee failed to consider other withdrawal calculation methodologies, used the wrong cost measures, and ignored Plaintiffs' inability to pay the required amounts, effectively preventing Plaintiffs from withdrawing from Tri-State.  (*See* ECF No. 208 at 22-24.)  From this evidence, a reasonable jury could infer that Tri-State's directors acted at least arbitrarily, and at worst in bad faith, in so calculating Plaintiffs' withdrawal terms.  Accordingly, Plaintiffs have shown a genuine dispute of fact as to their Withdrawal Claim, and summary judgment on that claim is not appropriate.

**C.      Plaintiffs' Cross-Motion**

Plaintiffs' Cross-Motion argues that it is entitled to summary judgment on Tri-State's statute of limitations affirmative defense.  (ECF No. 192 at 11-23.)  In response, Tri-State concedes that it has asserted its statute of limitations defense only against Plaintiffs' Rate Claims, not the Withdrawal Claim.  (ECF No. 205 at 14 n.2.)  The Court has granted Tri-State's Motion for Summary Judgment with respect to the Rate Claims in Part III.A., above.  Accordingly, Plaintiffs' Cross-Motion with respect to Tri-State's statute of limitations defense is denied as moot.

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.    Tri-State's Motion for Summary Judgment (ECF No. 195) is GRANTED IN PART and DENIED IN PART;

2.    Tri-State's Motion is GRANTED with respect to Plaintiffs' Rate Claims, and judgment shall enter in favor of Defendant on Plaintiffs' Claims 1 and 2;

3.    Tri-State's Motion is DENIED with respect to Plaintiffs' Withdrawal Claim;

4.    Plaintiffs' Motion for Partial Summary Judgment (ECF No. 192) is DENIED AS MOOT; and

5.    This action remains pending as to Plaintiffs' Claim 4 against Tri-State, Tri-State's Counterclaims against Plaintiffs, and Tri-State's Third-Party Claims against Ryan Reiber and Jerry Underwood, which are the subject of a pending Motion for Summary Judgment by the Third-Party Defendants.

Dated this 27th day of February, 2014.

BY THE COURT:

William J. Martínez
United States District Judge