**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 10-cv-02349-WJM-KMT

CHIMNEY ROCK PUBLIC POWER DISTRICT,
MIDWEST ELECTRIC COOPERATIVE CORPORATION,
NORTHWEST RURAL PUBLIC POWER DISTRICT, and
PANHANDLE RURAL ELECTRIC MEMBERSHIP ASSOCIATION,

      Plaintiffs,

v.

TRI-STATE GENERATION AND TRANSMISSION ASSOCIATION, INC.,

      Defendant.

---

### ORDER ON MOTIONS TO EXCLUDE EXPERT TESTIMONY UNDER RULE 702

---

Plaintiffs Chimney Rock Public Power District, Midwest Electric Cooperative Corporation, Northwest Rural Public Power District, and Panhandle Rural Electric Membership Association (collectively "Plaintiffs") bring this breach of contract action against Defendant Tri-State Generation and Transmission Association, Inc. ("Defendant"). The case is set for a seven-day jury trial beginning on May 19, 2014, with the Final Trial Preparation Conference set for May 1, 2014. (ECF No. 302.)

This matter is before the Court on two Motions to Exclude Expert Testimony pursuant to Federal Rule of Evidence 702, one filed by each party. (ECF Nos. 294 & 295.) For the reasons set forth below, both Motions are GRANTED IN PART and DENIED IN PART.

### I. LEGAL STANDARD

A district court must act as a "gatekeeper" in admitting or excluding expert

testimony.  *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232 (10th Cir. 2004).  Admission of expert testimony is governed by Rule 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based upon sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the witness has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  To qualify as an expert, the witness must possess such "knowledge, skill, experience, training, or education" in the particular field as to make it appear that his or her opinion would rest on substantial foundation and would tend to aid the trier of fact in its search for the truth.  *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004).  The proponent of the expert testimony bears the burden of proving the foundational requirements of Rule 702 by a preponderance of the evidence.  *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009).

## II.  ANALYSIS

Defendant moves to exclude testimony by Plaintiffs' damages expert, Stephen Duree, while Plaintiffs move to exclude testimony by Defendant's expert on economic and damages issues, George F. Rhodes, Ph.D.  (ECF Nos. 294 & 295.)  Neither party challenges the experts' qualifications.  Instead, each party contends that the opposing party's expert's testimony is unreliable, irrelevant, factually unsupported, and more prejudicial than probative.  (*Id.*)  The Court will discuss each party's motion in turn below.

### A.     Stephen Duree

In addition to Plaintiffs' claim that Defendant breached its contract by failing to provide Plaintiffs with equitable withdrawal terms ("Withdrawal Claim"), which is still at issue in this case, Plaintiffs originally brought two claims for a breach of the implied covenant of good faith and fair dealing regarding the rate Defendant charged them for electricity ("Rate Claims").  (*See* ECF No. 2.)  The Court granted summary judgment in favor of Defendant on Plaintiff's Rate Claims.  (ECF No. 300.)  However, the Court subsequently held that the fairness of the rates Defendant charged Plaintiffs for electricity is still at issue, insofar as Defendant used those rates to calculate the allegedly inequitable withdrawal terms it offered to Plaintiffs.  (ECF No. 330 at 4.)

Defendant's Motion to Exclude, filed prior to the Court's Order granting summary judgment on the Rate Claims, requests the exclusion of two categories of Mr. Duree's testimony: (1) all opinions regarding damages for Defendant's purported breach of the implied covenant of good faith and fair dealing, and (2) all opinions regarding Plaintiffs' potential withdrawal from Defendant, specifically Mr. Duree's calculation of equitable withdrawal terms.  (ECF No. 294 at 1.)  Plaintiffs declined to respond to Defendant's Motion as to the first category of testimony, apparently agreeing that the grant of summary judgment on the Rate Claims made that testimony irrelevant.  (ECF No. 306 at 2.)  The Court agrees with the parties that any testimony by Mr. Duree on damages caused by an alleged breach of the implied covenant of good faith and fair dealing

would be irrelevant,[1] as well as confusing to the jury, now that no such breach is at issue in this case. Such evidence is therefore inadmissible under Rules 402 and 403. Accordingly, Defendant's Motion is granted as to evidence regarding purported damages resulting from the Rate Claims, and Mr. Duree will not be permitted to testify as to those damages.

As to Mr. Duree's opinions regarding Plaintiffs' potential withdrawal, Defendant argues that this testimony should be excluded because it is based on speculative assumptions that are contradicted by the facts related to the possibility of Plaintiffs' withdrawal. (ECF No. 294 at 10-15.) Defendant's argument arises from the requirement under Rule 702(b) and (c) that expert testimony be both "based on sufficient facts or data" and "the product of reliable principles and methods". Defendant argues that Mr. Duree bases his calculation of so-called "equitable" withdrawal terms on an assumption that, after withdrawal, Plaintiffs would have been able to enter into replacement power supply contracts directly with Basin Electric Power Cooperative, Inc. ("Basin") and/or the Western Area Power Administration ("WAPA"), on the same terms that Basin and WAPA currently supply power to Defendant. (*Id.* at 11.) Defendant argues that there is no evidence in the record supporting this assumption, that it is completely speculative, and that it therefore results in an inadmissible expert opinion under Rule 702. (*Id.*)

---

[1] Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401.

In response, Plaintiffs contend that Mr. Duree's calculation of withdrawal terms did not rely on an assumption that Plaintiffs could enter into particular replacement contracts with Basin and WAPA on the same terms as Defendant's contracts with those suppliers, but rather used the numbers from Defendant's contracts to calculate the difference between Defendant's costs in supplying power to Plaintiffs and the rate that Defendant charged Plaintiffs for that power. (ECF No. 306 at 4, 7-14.) That is, Mr. Duree calculated damages on a disgorgement theory, by determining the allegedly wrongful profits Defendant earned due to its failure to provide equitable withdrawal terms to Plaintiffs. (*Id.* at 12-13.) Plaintiffs point out that Mr. Duree's opinion was based on a review of Defendant's financial documents, including documentation of Defendant's cost to purchase power to sell to Plaintiffs, its transmission expense to serve Plaintiffs, and its revenue recovered from Plaintiffs. (*Id.*) Accordingly, Plaintiffs argue, Mr. Duree's opinions are based on sufficient facts or data which were evaluated reliably so as to be admissible under Rule 702.

An expert witness may use assumptions in addition to facts to formulate his opinion, and the use of such assumptions does not make the opinion inadmissible. *See United States v. Crabbe*, 556 F. Supp. 2d 1217, 1224 (D. Colo. 2008) ("Reliance on assumptions does not necessarily preclude the opinion from having an adequate foundation under Rule 702. The accuracy of the assumption is not at issue for Rule 702 purposes . . . . The accuracy of the assumption is an issue for trial because it affects the weight of the opinion."). Defendant does not argue that Mr. Duree presents his assumptions as facts or that he has failed to sufficiently identify his assumptions as such, nor does Defendant contest the financial data upon which Mr. Duree based his

calculations. *Cf. Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1080 n.4. (10th Cir. 2006) ("Expert testimony that fails to make clear that certain facts the expert describes as true are merely assumed for the purpose of [the opinion] may not assist the trier of fact at all and, instead, may simply result in confusion . . . ."). Rather, Defendant contends that the assumption regarding alternative power suppliers is so lacking in support that it renders the opinion unreliable. (*See* ECF No. 309 at 8-9.)

The Court has reviewed the relevant portions of Mr. Duree's report and deposition, and finds that, while Mr. Duree explicitly states in his report that he assumed that Plaintiffs would enter into replacement contracts with Basin and WAPA, he clarified in his deposition that his calculation of Plaintiffs' damages did not *depend* on that assumption. (*Compare* ECF No. 294-2 at 11, *with* ECF No. 306-1 at 29-32.) Accordingly, the assumption is not so critical to Mr. Duree's calculations as to render his opinion unreliable as based on insufficient facts. Mr. Duree performed his calculations principally using Defendant's financial data, and the assumption that Plaintiffs could have found an alternative power supplier was not central to his disgorgement calculation. (*See* ECF No. 306 at 9-13, Ex. A); *cf. Crabbe*, 556 F. Supp. 2d at 1224 ("Depending on the case, the assumed fact may be so critical to the methodology that the witness' failure to ascertain the *actual* fact would render the application of the facts to the methodology unreliable; in such circumstances, the opinion would fail under Rule 702.") (emphasis in original).

Furthermore, insofar as Mr. Duree's opinions *do* rely on the assumption that Plaintiffs could have found a replacement power supplier, this case is distinguishable

from the authority cited by Defendant holding that an assumption cannot be used in an expert opinion where it is contradicted by the evidence of record. *See, e.g., Tyger Const. Co. Inc. v. Pensacola Const. Co.*, 29 F.3d 137, 142-43 (4th Cir. 1994) (holding that admission of expert opinion, which relied on an assumption that a lack of sand caused delay, was an abuse of discretion because assumption was contradicted by undisputed evidence showing no lack of sand during the relevant time); *see also Fanning v. Sitton Motor Lines, Inc.*, 2010 WL 4261476, at *7 (D. Kan. Mar. 10, 2010) (holding that a psychiatric expert's opinion regarding decedent's suicidal intention was inadmissible because it relied on presumptions about decedent's location in the roadway, about which expert was not qualified to testify).

      Here, Mr. Duree's assumption that Plaintiffs could have found a replacement power supplier is an inference that is not contradicted by the evidence, because there is no evidence that it would have been impossible for Plaintiffs to have found such a supplier. There is, at most, a lack of evidence that Plaintiffs actually found an alternative supplier, in part because Defendant allegedly obstructed Plaintiffs from obtaining any commitments from alternative suppliers. (*See* ECF No. 329 at 2-4.) While Mr. Duree's assumption may lack direct support in the evidence of record and require an inferential step, it is not contradicted by the evidence. Therefore, Mr. Duree's opinion is not inadmissible on that basis, and Defendants' arguments can be addressed by vigorous cross-examination. *See Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 596 (1993).

In its Reply, Defendant raises three new arguments.[2] First, Defendant contends that Mr. Duree's disgorgement calculation is unreliable because it relies on a legally erroneous assumption, namely that the rates Defendants charged Plaintiffs for power were improper and should not have been used in calculating withdrawal terms. (ECF No. 309 at 3, 9-10.) Because of the Court's ruling on summary judgment, Defendant argues that the propriety of its rates is no longer in question, and therefore those rates were permissibly used in the withdrawal terms Defendant offered Plaintiffs. (*Id.*) As discussed in the Court's Order on Defendant's Motion *In Limine*, the Order granting summary judgment on Plaintiffs' Rate Claims did not resolve the question of the fairness of those rates to the extent they were used in calculating withdrawal terms. (*See* ECF No. 330 at 3-4.) Accordingly, the portion of Mr. Duree's opinion that found inequitable the withdrawal terms Defendant calculated using its current rates is not inadmissible as a consequence of the Court's ruling on summary judgment.

Next, Defendant argues that Plaintiffs cannot prove that Defendant caused their losses if Plaintiffs cannot show that they could have withdrawn from Defendant and purchased power elsewhere. (ECF No. 309 at 2.) The Court agrees that as a matter of law, Plaintiffs must establish that Defendant's alleged breach of contract caused their damages before they may be awarded such damages. *See Runiks v. Peterson*, 392 P.2d 590, 590 (Colo. 1964). However, Defendant's attempt to suggest that Plaintiffs

---

[2] "[T]he general rule in this circuit is that a party waives issues and arguments raised for the first time in a reply brief". *M.D. Mark, Inc. v. Kerr-McGee Corp.*, 565 F.3d 753, 768 n.7 (10th Cir. 2009). However, given the fact that Defendant's Motion was filed before the Court's order on summary judgment, and in order to avoid delay in resolving the same arguments when raised at trial, the Court finds it both expedient and in the interest of justice to address these arguments herein.

lack evidence of such causation inappropriately injects a new summary judgment argument into Defendant's Motion to Exclude. The Court has already ruled on Defendant's Motion for Summary Judgment and declines to rule on new summary judgment arguments on the eve of trial.

Finally, Defendant raises a new argument that because disgorgement is an equitable remedy, it is a question for the Court, not for a jury, to resolve. (ECF No. 309 at 5-6.) Defendant has briefed this argument more fully in its Motion to Strike Jury Demand (ECF No. 310), upon which the Court has ruled in a separate order (ECF No. 345). In its Reply, Defendant fails to explain why, as an evidentiary matter, the question of law or equity on Plaintiffs' disgorgement remedy requires the exclusion of any part of Mr. Duree's opinion. Accordingly, the Court declines to consider this argument here.

In sum, the Court will exclude at trial the portion of Mr. Duree's testimony that relates solely to damages from the Rate Claims, and will permit Mr. Duree to testify as to Plaintiffs' withdrawal damages.

**B.     George F. Rhodes, Ph.D.**

Plaintiffs' Motion to Exclude initially argues that Dr. Rhodes's entire report should be excluded because it is purely rhetorical and speculative, his statements are conclusory and lack factual support, and certain phrases such as "death spiral" are inflammatory and unduly prejudicial. (ECF No. 296.) However, in their Reply, Plaintiffs acknowledge that they are only moving to exclude certain parts of Dr. Rhodes's opinions that are specifically identified in their Motion. (ECF No. 317 at 5.) Accordingly, the Court will review only those specifically identified opinions.

Plaintiffs challenge the following opinions, summarized as follows: (1) the assumption that the phrase "equitable terms and conditions" for withdrawal applies to all members, not only those withdrawing; (2) cooperatives like Defendant provide a risk-sharing function analogous to an insurance company; (3) Defendant's proposed withdrawal terms were based on a calculation principle that is virtually universal; (4) Plaintiffs did not engage in appropriate due diligence prior to the 2007 contracts; (5) Defendant's postage stamp rates are the most efficient rates, provide for the most efficient allocation of resources, and create the most cost effective organizational structure for cooperatives like Defendant; (6) the postage stamp rate is central to Defendant's existence and success as a cooperative enterprise and the core of Defendant's business strategy and success, without which Defendant would not likely have successfully launched or survived, while a cost-based rate would threaten those cooperative principles and incentives, would lead to member disagreements and infighting, and would, with reasonable economic probability, prevent Defendant from operating as a cooperative; and (7) a change in the rates would be akin to removing the keystone that causes "the arch to tumble", allow it to "crumble", or lead to a "death spiral". (ECF No. 296 at 8-13.) The Court will discuss each opinion in turn.

1. "Equitable Terms" Assumption

Plaintiffs challenge Dr. Rhodes's use of the assumption that "equitable terms and conditions" applies to all members. The Court discussed an expert's permissible use of assumptions in its discussion of the opinions of Mr. Duree, above. As such, Dr. Rhodes may use assumptions in formulating his opinions, as long as those assumptions are designated as such and are not contradicted by the evidence. *See Crabbe*, 556 F.

Supp. 2d at 1224. The challenged assumption is identified as such, and Plaintiffs have made no argument that it is contradicted by the evidence. Accordingly, the Court will not exclude Dr. Rhodes's opinion that assumes a particular construction of Defendant's bylaws.

    2.    <u>Insurance Analogy</u>

Plaintiffs challenge Dr. Rhodes's use of an analogy between the risk-sharing functions of a generation and transmission cooperative and an insurance company. Dr. Rhodes's report demonstrates that he has developed this analogy based on his experience with and analysis of economic generation and transmission cooperatives like Defendant. (*See* ECF No. 296-1 at 4-6.) Plaintiffs contend that this analogy is purely rhetorical, because Dr. Rhodes cites no insurance statistics or literature supporting it. (ECF No. 296 at 8.) The Court agrees with Plaintiffs that this analogy is rhetorical, because it appears to be used solely to shed light on the economic incentives involved in a generation and transmission cooperative. However, Dr. Rhodes does not purport to opine on the insurance industry, a field in which it is undisputed that he is not an expert; therefore, he need not cite insurance statistics or data.

Furthermore, the analogy's rhetorical nature does not make it inadmissible. Dr. Rhodes's experience as an economist qualifies him to discuss economic issues, and his analogy compares the economic function of an insurance system with the economic function of a generation and transmission cooperative. (*See* ECF No. 296-1 at 7-8.) Plaintiffs do not contend that Dr. Rhodes's economic expertise excludes the economic functioning of insurance systems, and therefore the Court finds that Dr. Rhodes's

experience as an economist permits him to apply general economic principles to draw this analogy. Of course, if Dr. Rhodes includes this analogy in his testimony at trial, Plaintiffs are free to cross-examine him with respect to his lack of expertise in insurance to reveal any weaknesses in the comparison.

### 3. "Virtually Universal"

Regarding Dr. Rhodes's statement that Defendant's withdrawal calculations were based on the "virtually universal principle of present value of net lost contribution to the cooperative", Plaintiffs argue that Dr. Rhodes has provided no explanation or support for his statement that this principle is "virtually universal". (ECF No. 296 at 10.) The Court agrees that in calling the principle "virtually universal" without explanation, Dr. Rhodes's report implicitly disparages any other method of calculation by suggesting that it would be in the vast minority. However, in his deposition, Dr. Rhodes explained that in his nearly 40-year career as an economist, he had "never seen any other methodology applied in . . . the context of cutting off a cash flow." (Rhodes Dep. (ECF No. 307-3) p. 41.) Thus, Dr. Rhodes's statement was based on his expertise gained through experience, which Plaintiffs do not challenge. Should Dr. Rhodes use these adjectives in his testimony, he will be required to provide support for them, but it is sufficient that he explain that in his experience, the application of this principle is universal.

### 4. Plaintiffs' Due Diligence

Plaintiffs also move to exclude the portion of Dr. Rhodes's evaluation of Jim Anest's deposition testimony wherein Dr. Rhodes opined that Plaintiffs did not engage in "an appropriate due diligence as would be required for such negotiations" for a

different rate in their 2007 contracts.  The portion of Dr. Rhodes's opinion regarding the negotiations for cost-based rates prior to the execution of the 2007 contracts was explicitly directed at rebutting Plaintiffs' expert's opinions that Defendant should have charged cost-based rates.  (*See* ECF No. 296-1 at 14-15.)  Plaintiffs have agreed that they will not present evidence that Defendant should have charged them cost-based rates, and the Court has found any such evidence irrelevant to the Withdrawal Claim.  (ECF Nos. 329 at 1; 330 at 2.)  Because that evidence will not be admitted, the portion of Dr. Rhodes's opinion to rebut those opinions is similarly inadmissible as irrelevant under Federal Rule of Evidence 402.

        5.        <u>Postage Stamp Rates Are the Most Efficient and Effective</u>

Plaintiff objects to numerous portions of Dr. Rhodes's opinion that tout the superior efficiency and effectiveness of postage stamp rates over cost-based rates for cooperatives like Defendant.  Dr. Rhodes explains, in portions of his report to which Plaintiffs do not object, that the postage stamp rate is based on Defendant's overall costs, and that it meets Defendant's goals to provide maximum usage of electricity with minimum restrictions and cost to the consumer.  (ECF No. 296-1 at 6-12.)  These explanations suffice to support an opinion that postage stamp rates are efficient and effective for a cooperative that desires to distribute its risk and costs evenly across its membership.  Dr. Rhodes also provides some comparisons to what he perceives as Plaintiffs' proposed rate system, explaining how that system would produce detrimental economic incentives.  (*Id.* at 18.)  However, Dr. Rhodes does not explain why postage stamp rates are *the most* efficient and effective for Defendant to meet its goals, or why they provide *the most* efficient allocation of resources.  (*Id.* at 12-13, 15-18.)

One can conceive of an economic analysis, properly based in Dr. Rhodes's experience as an economist, that would sufficiently explain Dr. Rhodes's opinion of the superior efficiency of the postage stamp rate as compared to various alternative rate systems.  However, no such analysis is included in Dr. Rhodes's report, nor do the portions of Dr. Rhodes's deposition cited by Defendant elucidate the economic basis for concluding that postage stamp rates are "the most effective and efficient".  (*See* ECF No. 307 at 13 (citing Rhodes Dep. pp. 49-50, 53, 61-66, 70-72, 83-84).)  Accordingly, Dr. Rhodes may testify to the comparative effectiveness and efficiency of the rate systems as disclosed in his report, but he will not be permitted to use superlatives such as "the most efficient" unless they are specifically based on his economic analysis.

      6.      <u>Postage Stamp Rates Are the Core of Defendant's Existence and Success, and Any Alternative Threatens Defendant's Survival</u>

Plaintiffs contest numerous statements in Dr. Rhodes's report opining that the postage stamp rate is central in every respect to Defendant's existence, business strategy, and success as a cooperative enterprise, and that Defendant would not likely have successfully launched or survived without it.  Plaintiffs argue that such statements are inadmissible as unsupported and overbroad.  (ECF No. 296 at 10-13.)

Dr. Rhodes's report explains the basis for his opinions that the postage stamp rate is economically rational, provides a system of economic incentives that supports Defendant's cooperative structure, and is centrally integrated into Defendant's business model, as well as his opinion that a change in rates would have a negative impact on Defendant's members' incentives to remain in the cooperative.  (*See* ECF No. 296-1 at 16-20.)  Dr. Rhodes also suggests that, if some members defected from Defendant's

cooperative due to reduced benefits from a cost-based rate, other members would likely follow because they would no longer have an economic incentive to remain. (*Id.* at 20.) Accordingly, such statements may be admitted as based on Dr. Rhodes's experience as an economist.

However, Dr. Rhodes fails to explain the economic basis for the statements that the postage stamp rate is "specifically and definitely required" for Defendant's functioning, that Defendant "requires unified rates . . . to exist and fulfill its purposes", or his predictions that a change in rates would be "contrary in every material respect to the economic principles that underlie the successful creation of a cooperative enterprise such as [Defendant]", would "with reasonable economic probability . . . impair [Defendant's] ability and capacity to function as a cooperative", and would "pivotally alter[] the incentives to cooperate that have governed [Defendant] and accounted for its success up to this time." (*Id.* at 13-18.) Defendant's Response fails to identify support in Dr. Rhodes's report for each of these statements, instead generally arguing that Dr. Rhodes's opinions are supported by his experience. (*See* ECF No. 307 at 9-13.) Defendant bears the burden of establishing the admissibility of its expert opinions, and it has failed to meet that burden as to these opinions. *Nacchio*, 555 F.3d at 1251.

The Court finds the hyperbolic nature of these challenged statements—which effectively state that Defendant's survival depends on the use of the postage stamp rate—unsupported by the analysis in Dr. Rhodes's report. Dr. Rhodes's opinions as to the economic detriment caused by a change in rates are explained by his economic analysis of a shift in incentives among members, and he specifies predicted negative outcomes that may likely result from such a shift. However, he does not explain how

the postage stamp rate is so vital and central to Defendant's functioning that its demise is an economic certainty if it uses any other rate system, nor does he base such a prediction on any factual data or his economic expertise. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").

Accordingly, Dr. Rhodes may permissibly testify about the economic structure of Defendant's cooperative, as well as about specific negative economic outcomes that may result from a change in rates. But his extreme and hyperbolic statements that are unsupported by any economic analysis, as discussed in detail above, will be excluded at trial.

### 7. "Tumble", "Crumble", and "Death Spiral"

Finally, Plaintiffs challenge Dr. Rhodes's uses of particular language that they deem inflammatory and prejudicial, such as his statements that a change to cost-based rates would cause "the arch to tumble", allow Defendant's cooperative to "crumble", or lead to a "death spiral". (ECF No. 296 at 13-14.)[3]

The Court has discussed above the reasons for excluding Dr. Rhodes's hyperbolic opinions of Defendant's imminent demise if it were to use a different rate

---

[3] Plaintiffs' Motion also raises objections as to Dr. Rhodes's opinions that Plaintiffs could have or should have attempted to change the rates in their 2007 contracts. (ECF No. 296 at 14.) However, Defendant withdrew these opinions in its Response. (ECF No. 307 at 3 n.1.) Accordingly, the Court need not issue a ruling on those objections.

system, as such opinions lack support in his report. Dr. Rhodes's statements regarding the tumbling or crumbling arch will similarly be excluded insofar as they are also unsupported by any economic analysis.

As to the term "death spiral," the Court finds this phrase particularly and inappropriately inflammatory and prejudicial to Plaintiffs. Defendant contends that it is a term of art, but has agreed that if it is found objectionable, Dr. Rhodes will substitute the term "domino effect". (ECF No. 307 at 14-15.) Plaintiff disagrees with Defendant's argument that the "domino effect" concept was approved by the Tenth Circuit in a prior case brought by Defendant, but does not appear to object to the phrase itself. (ECF No. 317 at 9.)

Dr. Rhodes's report explains that a "death spiral" can result from a decreased member base that requires higher rates to cover its costs, which produces further incentives to members to withdraw and further increases rates. (ECF No. 296-1 at 20.) This explanation is sufficiently grounded in Dr. Rhodes's economic expertise and explained by analysis, and therefore the concept will be admissible at trial. The Court accepts Defendant's substitution of the term "domino effect" and will permit Dr. Rhodes to testify as to the possible "domino effect" that could result from a change in rates, but Dr. Rhodes is expressly prohibited from using the phrase "death spiral" during his testimony at trial.

### III.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Defendant's Motion to Exclude Expert Testimony of Stephen Duree (ECF No. 294) is GRANTED IN PART and DENIED IN PART as set forth herein; and

2.	Plaintiffs' Motion to Exclude Expert Testimony of George F. Rhodes, Ph.D. (ECF No. 295) is GRANTED IN PART and DENIED IN PART as set forth herein.

Dated this 30th day of April, 2014.

BY THE COURT:

William J. Martinez
United States District Judge